[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 386 
The only clauses of the will of James Emans which are material to the questions to be considered are the following:
"Thirdly, it is my will that all the residue of my estate, both real and personal, after paying out the legacies above mentioned, my just debts and funeral expenses, should be equally divided among my sons, Cornelius, James and John, and my daughters Elizabeth, Catharine, Ann and Margaret."
"Fourthly, it is my further will that, in case either of my said sons and daughters last mentioned should die without lawful issue, the proportion of my estate which he or she may *Page 387 
receive by virtue of this will, shall be equally divided among the survivors."
The question is, whether the interest of the daughters in the real estate of their father, and especially their contingent right of survivorship, under the fourth item of the will, passed to the sons by the deed of the 14th of June, 1810. To determine this question, it is necessary to recur to some of the principles which govern this mode of conveyance. A release was a form of transfer, used at common law only where some right to real estate existed in one person, the actual possession of which was in another. The possession in such case was said to "countervail livery" (Dyer, 269, pl. 20, in marg.), that is, it supplied the place of and rendered unnecessary that open and notorious delivery of the possession which the common law required in cases of transfer of lands.
After the statute of uses, however, by force of which certain words in a conveyance were held to transfer a constructive possession, deeds combining the necessary words under the statute, with the operative words of a release, became a common mode of conveying lands to parties not in possession. The deed in question here contains no words which could give it effect under the statute of uses. It is a pure deed of release at the common law, and is governed by common law principles alone. Had it even been executed after the Revised Statutes, the questions would have been the same as now; because no language is inserted which could bring it within the provisions of those statutes, making "expectant estates" alienable. Under those provisions they are to be aliened "in the same manner as estates in possession," that is, by "grant," to constitute which, under the statute, required either a formal grant at common law or an instrument valid as a conveyance under the statute of uses. (1 R.S., 726, § 35;id., 738, §§ 136, 138, 142.)
It will be useful here to notice the different modes in which releases operated at common law. They were said to enure in four several ways, viz.:
1. Per mitter le droit: As where a person who has been disseised releases to the disseisor, his heir or feofee. There, by *Page 388 
the release, the right which was in the releaser is added to the possession of the releasee, and the two combined perfect the estate.
2. Per mitter l'estate: Where two or more are seised, either by deed, devise or descent, as joint-tenants or coparceners of the same estate, and one of them releases to the other, this is said to enure by way of mitter l'estate. As this is the mode in which the release in this case must operate, if at all, in transferring the absolute vested interest of the daughters, it will be well to dwell for a moment upon it. At common law, joint-tenants could release to each other, but tenants in common could not. (Shep. Touch., 326, 327.) The reason was that each joint tenant was deemed to be seised of the whole estate and not of his separate portion only. He was seised per my and pertout; and hence a conveyance might be made to him without livery of seisen. But tenants in common being seised of their respective portions alone, no title could pass from the one to the other without livery. Under the statute of uses, it is true, one tenant in common could release to another by inserting words of bargain and sale. This release, however, contains no such words, and must, therefore, operate, if at all, by force of the common law. It is clear, then, that if the devisees, under the will of James Emans, were tenants in common merely, this release would be entirely inoperative, even as to the vested interest of the daughters. The recital in the release of the fact of possession in the releasees, would be construed in accordance with the actual title with which they were clothed.
It is perhaps not easy to say what is the precise nature of the estate created by this will. In cases of joint tenancy the right of survivorship is absolute to the tenant who survives. Here it depends upon the additional contingency of the death of a co-tenant without issue. It is this right of survivorship, giving to each joint-tenant an interest in the whole estate, which causes each to be deemed seised of the whole. But this interest, even of a joint-tenant, is contingent upon his surviving his co-tenant. Here another contingency is added, and *Page 389 
the interest, therefore, is a little more remote. Still, as the interest of each devisee, however remote, pervades the whole estate, their seisin should, I think, as in the case of joint tenants, be deemed to extend to the whole. The counsel for the plaintiffs must, I apprehend, have come to this conclusion, as he has not made the point.
3. A third mode in which releases operate, is that of enlarging an estate. This is where a person who has a future interest, either vested or contingent, releases to one who has the possession or some vested estate in the premises. At common law such a release could only be made to one who had an actual rightful possession. Under the statute of uses it might be made to any one who had a vested estate, provided the necessary privity existed; that is, provided the right released and the interest of the releasee were parts of the same estate.
4. The fourth mode in which releases operate is by extinguishment. Where the right released is of such a nature that it cannot be enjoyed in connection with the estate of the releaser, then it becomes extinguished: as where the lord releases his seigniory to the tenant. It will be unnecessary to notice this class further.
The release in the present case, so far as it purports to convey the future interests of the releasers, comes obviously under the third head; and operates, if at all, by way of enlarging the estate of the releasees. It being executed to parties in the actual possession of the premises, it was not necessary that it should contain any words to give it effect under the statute of uses. Two objections are made to its operation, viz.: 1. That the words used to describe the interests conveyed, do not embrace the contingent rights of survivorship of the releasors; and 2. That as bare possibilities, those rights could not be released.
The words of the release are, "all the right, title, interest, property, claim and demand of any nature of the said parties of the first part, of, in, or to the said lands, tenements, or hereditaments, and the reversion or reversions, remainder or remainders, *Page 390 
rents, issues and profits thereof." These words would seem expressly designed to cover every possible interest which the parties might have, and I cannot doubt that they were understood and intended to embrace the interest in question. That interest is in substance a contingent remainder. The difference between an executory devise and a contingent remainder is chiefly in name. In the case of Moor v. Hawkins (1 Hen. Black., 34), an executory devise of precisely the nature of that existing here, was held to pass by the will of one Cochran, devising "all the estate whereof he was seised in possession, remainder or reversion." The question here is one of intention, and the broad and general scope of the language used clearly indicates that it was intended to embrace every interest possessed by the parties, whatever might be its nature. It is, moreover, an established rule, that general words like these, contained in a release, are to be taken most strongly against the releasers. Thorpe v.Thorpe (1 Lord Ray., 235).
This brings us to the question whether a contingent interest like this, that is, a mere possibility, can be released. In determining this question, there are two separate principles to be considered, which to avoid confusion, must be kept entirely distinct. The first consists of that rule of policy which prohibits the granting or assigning of remote and contingent rights to real estate, in the same manner and for the same reason that the common law prohibited the assignment of choses in action, viz., because such transfers were thought to promote litigation. "To prevent maintenance and the multiplying of contentions and suits, it was an established maxim of the common law, that no possibility, right, title, or any other thing that was not in possession, or vested in right, could be granted or assigned to strangers." (But. and Har., note 212 to Co.Litt., 264, 266.)
But the same policy which prohibited the transfer of these contingent rights to strangers, tended to encourage their release to parties already possessed of some estate in the premises. By such a merger of rights the sources of litigation were obviously *Page 391 
diminished. Accordingly we find another annotator upon Coke andLittleton, saying, "with respect to things that may be released, it is a rule of law, that no possibility, right, title, or thing in action, shall be granted or assigned to a stranger on account of the danger of maintenance, and of multiplying contentions and suits. But although a mere possibility cannot be released to a stranger, yet all rights, titles and actions, may be released to the terre-tenant for securing his repose and quiet, and for avoiding contentions and suits." (Thomas' Coke,note F, p. 456; Litt., § 446.)
The common law, therefore, favored the release of such rights to the terre-tenant, and the remoteness of the contingency afforded no objection.
The other rule alluded to is this, viz.: that unless there be something in esse to be released, there can be no release; a rule precisely analogous to that which holds that a thing to be sold is essential to a sale. There is no objection to a release to the terre-tenant of a mere possibility, however remote, except that afforded by this latter rule; which has never, I apprehend, been applied to a case like this.
Three cases are given in all the old elementary works, as illustrative of the class of possibilities which cannot be released. As stated by SHEPPARD, they are as follows: "And a remote possibility that is altogether uncertain cannot be released, and therefore if the son of the disseisee release to the disseisor in the lifetime of his father, this release is void. And so if the conusee of a statute release his right to the land of the conusor, before execution, this release is void. And so if the plaintiff release to a bail in the King's Bench before judgment given, this release is void. (Shep. Touch., 322.)
Now while it cannot be denied that in each of the three cases thus grouped together by SHEPPARD the release would be void; yet it is clearly erroneous, to rest their invalidity upon the ground of mere uncertainty, as is here done. The two last of the cases, viz.: that of the release by the conusee of the statute, and that by the plaintiff to the bail, are clear cases of a release of a thing not in esse. The right had no existence *Page 392 
at the time, and could not, therefore, be released; although it might come into existence afterwards upon certain contingencies, viz.: the issuing of an execution upon the statute or the recovery of a judgment in the King's Bench.
It is not the mere uncertainty, therefore, that prevents the operation of the release in such cases. There is a large class of possibilities, or contingent interests, equally uncertain, to a release of which there is no objection. They are described inLampet's case (10 Coke, 50), from which much of the law on this subject is drawn. According to Lord COKE, it was there resolved, "that a future right or possibility, which may be released, ought to have a foundation and an original inception as aforesaid; so it ought to be a necessary and common possibility, which in Cholmley's Case, in the second part of my [Coke's] reports (fol. 51 a, 6) is called potentia propinqua; and a possibility which depends upon the death of a man, has a necessary and common intendment, scil., necessary, in respect that all the sons of Adam must die; and common, that the death may happen at such a time that the contingency may take effect."
Again, it is not the uncertainty that prevents the operation of the release in the first of the three cases put by SHEPPARD. That case seems to have been taken from Littleton (§ 446), where it is stated as follows: "For if there be father and son, and the father be disseised, and the son (living the father) releaseth by his deed to the disseisor, all the right which he hath, or may have in the same tenements, without clause of warranty, c., and after the father dieth, c., the son may lawfully enter upon the possession of the disseisor; for that he had no right in the land in his father's life, but the right descended to him after the release made by the death of his father."
LITTLETON has been understood here to rest the invalidity of the release, upon the contingent and uncertain nature of the right, although this is not the precise import of his language. But there is an obvious reason why the release would be void aside from that which he gives. The case supposed is one *Page 393 
where the release must operate, if at all, per mitter le droit;
because the releasee is a trespasser, and has but a naked possession, and no right. It is plain that, in such a case, the release, to be valid, must transfer a present right. It must make that possession rightful, which before was wrongful. The whole operation of such a release, is based upon the idea of legitimatizing a wrongful possession. Hence it is said inJacob's Law Dictionary (Title, Release): "It is necessary inall cases where a release of lands is made, that the estate beturned to a right, as in a disseisin, c., where there are two rights, a right of possession in the disseisor and a right to the estate in the disseisee."
No release can be valid which does not unite these two rights; and hence no one can release to the disseisor but the disseisee himself. The heir of the disseisee cannot release, because he has no present right to the estate, and the possession of the disseisor would remain as wrongful after the release as before. The father might still enforce his right, and oust the disseisor, and then the release would be the same as if made to a stranger, contrary to the settled rules on the subject. All this is plain and admits of no dispute.
There is a passage in Lampet's case (10 Coke, 51), which, as it throws some light upon the origin of the idea, which I hold to be entirely without just foundation, that the mere uncertainty of a right affords a reason why it cannot be released to a party in possession, it may be expedient to notice. It is as follows: "It was further resolved, that where there is uncertainty in the person no release can be made; and, therefore, if a lease for life be made, the remainder to the right heirs of J.S., and the lessee is disseised, and the eldest son of J.S. releases to the disseisor, and afterwards J.S. dies, the release is void for it is uncertain whether he would be right heir at the time of the death of his father. And in 17 Elizabeth, this case was moved at bar in the King's Bench: A man made a lease to husband and wife for twenty-one years, the remainder to the survivor of them for twenty-one years, and the husband granted over this term; and it was held by *Page 394 
WRAY, Ch. J., and totam curiam, that the grant was void forthe uncertainty of the person."
Now it is perfectly clear that the release by the eldest son of J.S., in the example here given, would be void, entirely irrespective of the uncertainty of his right; it being made to a trespasser, and yet transferring no right to the possession; that right being vested exclusively in the tenant for life, supposed to have been disseised. But the omission in the passage quoted, of this conclusive reason why the release would be void, is not more remarkable than the authority given for the effect attributed to what is called the uncertainty of person. In the case cited from the King's Bench, the husband had granted, not released, to a stranger the entire term absolutely, when his right to a portion of it depended upon the contingency of his surviving his wife. This grant was void, first, because it attempted to convey a greater right than the grantor had. In the next place, it would have been equally void if it had simply purported to release the contingent right of the husband, because made to a stranger, and not to a terre-tenant. What such a case could have to do with the example given in the preceding sentence it is difficult to see; and yet it seems to have been the source from which the idea of uncertainty as the cause of the invalidity of the release is borrowed.
As much of the law on the subject of the release of possibilities has been drawn from Lampet's case, it is not unlikely, that the passage here quoted has given currency to, if it did not originate the idea, that the mere uncertainty of a right presents an obstacle to its being released. That idea is so directly in conflict with the reason universally given why contingent estates, while they cannot be aliened to strangers, are, nevertheless, allowed to be released to the terre-tenant, viz.: that such releases tend to repose and quiet, and to prevent contention, that it seems quite impossible it should be well founded. Whenever this subject shall be fully examined it will, I think, be found that any and every contingent right, however uncertain, may be released to a party already seised of a present estate in the premises in possession; and that the mere remoteness *Page 395 
of the contingency affords no objection to its being so released, provided the right can be said to have any present existence at all.
The interests in question here, viz.: the right of survivorship among the devisees of James Emans, come most plainly and completely within the description given by COKE, in the extract taken from Lampet's case, of possibilities which may be released. They had a distinct "foundation and inception" in the will, and the events on which they depended, were such as must necessarily occur. Nothing remained to be done, but to await the natural progress of events, which, to use the language of COKE, might "happen at such a time that the contingency might take effect." The present case may, I think, be distinguished from that of Anderson v. Jackson (16 John., 382).
It follows from these views, that the release in this case was valid, and operated to transfer the contingent as well as the vested rights of the releasors.
The judgment of the Supreme Court must, therefore, be reversed, and there must be a new trial, with costs to abide the event.